UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Tyrone Langford, Rupert Blackwood, Linda Colley, Abraham Hyatt, Bentley Kennedy and Derrick Nalty, | 18 CV 7041 (LDH)(RER) |
| Plaintiffs, | |
| - against - | Declaration of Shane Thompson, PhD. |
| International Union of Operating Engineers Local 15, 15A, 15B, 15C, 15D and 15H, Thomas A. Callahan Robert Burns, Andrew Cullimore, Christopher Thomas and John McNamara, | |
| Defendants. | |

Shane Thompson declares under penalty of perjury that the following statements are true and correct to the best of his knowledge, information, and belief:

1. The Union's referral database includes a field labeled "Request_by." According to the Union, this field indicates the manner in which the member was requested to be referred. My member referral data file had 22,775 records. Of those, 20,172 were coded as a "2," which corresponds to a "call in." 382 were coded as requested by the contractor, and 57 were "found own job." 2,164 were "non-referrals," mostly "called no answer."

2. The Union states that I did not consider the "time of day" that referrals were made in analyzing out-of-order referrals. That is true in one sense, but not true in another. The Union's database does not have any reliable information regarding when a referral was made. There is a field labeled "referred" which contains the date, but no time information. There is another field labeled "inserted_date" which does contain time information, and it is possible that it was intended to capture the time of day that a referral was made. The problem, however, is that about half of the records contain dates other than the date the referral was made, ranging from five years before the referral was made to nine months after the referral was made.[1]

---
[1] Several different versions of this table were produced containing inconsistencies that are not readily explicable. In the last version produced, about one third of referrals are from a day other than the day of the referral, with variations from three years before to nine months after.

Given the patent inaccuracy of this data, it was impossible to rely on this field for the time of day of the referral.

3. Dr. Lundquist claims in her report to have performed an analysis using the time of day of referral, but she does not explain how she did that or what field she used. Perhaps Dr. Lundquist used the "inserted_date" field in this analysis, which was plainly inaccurate, to conduct this analysis as I am not aware of another field she could have possibly used. Of course, if Dr. Lundquist ignored half the data, her results are meaningless.

4. Where two referrals were made on the same day, I considered them as "not out of order," even though they might well have been. In other words, because there were no reliable timestamp data, I had to throw out the possibility of same-day out-of-order referrals. Accordingly, my out-of-order analysis is an *under*estimate of the actual number of out-of-order referrals.

5. Dr. Lundquist criticized me for including "refusals" in the out-of-order analysis. That is not a valid criticism. What I was asked to analyze was how the Union made referrals, and in this regard, an attempted referral evidences how the Union *wanted* to make a referral. If a referral was refused for some reason, it is irrelevant to the actions of the Union which *preceded* the refusal.

6. In their rule 56.1 statement, defendants state that I did not take into account whether a contractor requested a member with more than one certification. They did not point out any such instances. In my out-of-order analysis, I looked only at members who had the certification requested by the contractor.

7. In their rule 56.1 statement, defendants state that I did not take into account referrals for future dates. They did not point out any such instances, or if there were, how the business agent would know who to refer. The database contains no field for future referrals.

8. Dr. Lundquist criticized my analysis for counting single out-of-order referrals as more than one out-of-order referral. What I measured was the number of times that members were passed up, i.e., if three members were passed up on a single referral, it counted as three pass-overs – three Union members who were passed over for a job. The Union may view this as a single pass-over referral, but the three engineers certainly wouldn't see it that way. It would be three distinct pass-overs.

9. The only example cited by defendants is a January 2, 2013 referral to Joan Hoge, which defendants note was a request by the contractor for a woman. Defendants did not address, however, why Peggy Lewis, a Black woman qualified for the same job who had a lower reference number and signed into the referral hall before Joan Hoge on January 2, 2013, was passed over.

10. The Union does not keep a record of jobs that members obtain on their own. My understanding is that this information is required to be, and generally is, communicated to the Union, but the Union chooses not to make any record of it. Further, my understanding is that plaintiffs allege that the Union arranges jobs for members that are not reflected in the referral hall records, particularly long-term assignments at major construction projects, and that there is some evidence of this happening. For obvious reasons, the Union does not keep any records of these activities.

11. Jobs obtained directly by members is race-neutral on its face. There is no reason to suppose that White members are better at finding their own jobs than Black members. The inclusion or exclusion of race-neutral data in a regression analysis would not have any impact on the results of that analysis as it pertains to race.

12. The Union's records reflect the following facts: 8,261 members were admitted after August 1, 1972. 380, or 4.6 percent are Black and 493, or 5.9 percent, are Hispanic.

13. The Union's database shows that during the relevant period, Blacks accounted for 20 percent of hall attendances, or more than 5 times their proportionate union membership.

14. The Union's database shows that during the relevant time period, of the 20 members with the most hall attendances, 11 were Black.

15. The Union's database shows that plaintiff Langford had the 6th-most hall attendances during this period (496 appearances).

16. Plaintiff Blackwood had the 11th-most hall attendances during this period (439 appearances).

17. Plaintiff Colley had the 12th-most hall attendances during this period (434 appearances).

18. Plaintiff Hyatt had the 19th-most hall attendances during this period (366 appearances).

19. The Union's work history records show the number of hours worked during any given period on a per employer basis.

20. Therefore, the number of hours worked for a given employer during any one period is an appropriate proxy for the length of that member's job with that employer.

21. During the relevant time period, the average number of regular hours redeemed per employer per period by a White member was 288.

22. The same number for each plaintiff is as follows:

| Langford | 72 |
| Hyatt | 75 |
| Kennedy | 192 |
| Colley | 32 |
| Nalty | 60 |
| Blackwood | 51 |

23. During the relevant time period, the average number of overtime hours redeemed per employer per period by a White member was 50.

24. The same number for each plaintiff is as follows:

| Langford | 22 |
| Hyatt | 8.5 |
| Kennedy | 7.2 |
| Colley | 9.7 |
| Nalty | 16.3 |
| Blackwood | 4.8 |

25. The out-of-order analysis shows beyond any doubt that the Union does not follow its own referral rules. Overall, this is detrimental to Blacks on a statistically significant level.

26. I determined that the number of referrals per 1,000 hours of work was the most appropriate metric for analyzing the Union's records, because it focused on the amount of work that members obtained, which in turn determines how much money they earn. It also measures the difficulty that a member encounters in obtaining work, expressed as the number of times that the member has to present himself to the referral hall to get that work.

27. I rejected the number of referrals as a meaningful metric, because it was not race neutral and because it ignored the fact that fewer referrals corresponded with longer jobs, which was a desirable outcome. The number of referrals is not race neutral, because Blacks attend the referral hall more often than Whites. The more significant question is *why* do Blacks attend the referral hall so much more often than Whites?

28. I controlled for relevant certification by comparing plaintiffs to other members who had no certification that the plaintiff in question did not have. This ensured that every job that a comparator received was a job that the plaintiff in question could have performed. I referred to these comparators as "peers."

29. I determined that non-white members and female members had to visit the referral hall far more often than White and Male engineers to get the same amount of work, with statistical significance at the 1-percent level.

30. When compared to their peers, plaintiffs were extreme outliers, making far more visits to the referral hall and getting far fewer work hours.

31. In response to criticism leveled by Dr. Lundquist, I expanded the notion of peer by grouping certifications into categories. This increased the sample size of each plaintiff's peers. I did this to determine whether there was any validity to Dr. Lundquist's criticisms.

32. The breakdown in categories is annexed hereto as Exhibit A.

33. The results of my expanded peer analysis were consistent with my initial peer analysis, as summarized in the table below:

| Plaintiff | Avg visits to hall for 1,000 hours of work | Avg number of category peers | Avg visits to hall for 1,000 hours of work for peers |
| --- | --- | --- | --- |

| Langford | 78 | 279 | 9.6 |
| Nalty | 38 | 279 | 9.6 |
| Blackwood | 109 | 51 | 6.1 |
| Colley | 616 | 647 | 13.13 |
| Sosa | 40 | 647 | 13.13 |
| Hyatt | 54 | 51 | 6.1 |

34. In her report, Dr. Lundquist claims to have repeated my out-of-order referral analysis but taking into account the time that the referral was made. Dr. Lundquist does not explain how this was done, does not identify what data she used, and does not share the results of the analysis apart from her conclusory summary. Again, the analysis that Dr. Lundquist claims to have performed could not be done accurately, because the Union's records do not reflect the time of referral as I explained above in paragraphs 2 and 3.

35. Dr. Lundquist claims to have analyzed the number of referrals obtained by each plaintiff and concluded that the number of referrals they received was proportionate to the number of visits that they made to the referral hall. Albeit faulty for a number of reasons, this analysis is essentially irrelevant, because the essence of plaintiffs' complaint is that they have to go to the referral hall too many times and receive too few hours of work, which is why I looked at the number of hall visits to obtain 1,000 hours of work.

36. Dr. Lundquist performed some calculations and made some observations based on the "top ten" types of jobs requested via the referral hall, discussed above by defendants at paragraphs 46-48. This analysis is misleading for several reasons. First, it says nothing about other engineers, e.g., how many jobs does the average White engineer have certifications for? For example, if the average White engineer is qualified for 25 percent of the jobs, we would expect Langford to receive more referrals since he is qualified for 55 percent of the jobs.

37. Dr. Lundquist's "top ten" analysis is also erroneous because it fails to take into account the number of engineers who have qualifications for any particular job classification. For example, only 144 members have the state welding certification. There were 765 referrals during the relevant time period,

which, if evenly distributed amongst qualified members (without consideration of hall attendances), would result in 5.31 jobs per member.

38. Conversely, 1,611 members are qualified for pump jobs. There were 2,696 referrals for pump jobs, which, if evenly distributed amongst qualified members (without consideration of hall attendances), would result in 1.67 jobs per member.

39. Therefore, having a state welding certification *should* result in more referrals than having a pump certification, even though there were more than three times as many pump jobs.

40. Another reason the "top ten" analysis is meaningless is because it fails to take into account the qualifications of members who attended the hall and how many times they attended the hall. For example, only 97 members received referrals for jobs requiring state welding licenses, suggesting that about a third of the members with that qualification never or rarely attended the referral hall.

41. The out-of-order analysis showed that from 2013 through 2019, a job was assigned to a White member that plaintiff Langford was qualified for on 333 occasions, even though Langford was in the referral hall and had a lower reference number than the White member.

42. The out-of-order analysis showed that from 2013 through 2019, a job was assigned to a White member that plaintiff Blackwood was qualified for on 86 occasions, even though Blackwood was in the referral hall and had a lower reference number than the White member.

43. The out-of-order analysis showed that from 2013 through 2019, a job was assigned to a White member that plaintiff Colley was qualified for on 143 occasions, even though Colley was in the referral hall and had a lower reference number than the White member.

44. The out-of-order analysis showed that from 2013 through 2019, a job was assigned to a White member that plaintiff Hyatt was qualified for on 93 occasions, even though Hyatt was in the referral hall and had a lower reference number than the White member.

45. The out-of-order analysis showed that from 2013 through 2019, a job was assigned to a White member that plaintiff Nalty was qualified for on 23 occasions, even though Nalty was in the referral hall and had a lower reference number than the White member.

46. In paragraph 115 of their Rule 56.1 statement, defendants point out a discrepancy in the population of engineers in Tables 2 and 5 of my report. The reason for the discrepancy is because in reporting the total number of members, I did not exclude the branches of Local 15 that did not use the referral hall. I corrected that error and reran the numbers. The results are the same. Whites had to visit the hall 7.6 times to get 1,000 hours, non-Whites had to visit 16.4 times to get 1,000 hours. The level of statistical significance is unchanged, and the numbers for the individuals and their peer groups remain unchanged.

47. In their Rule 56.1 statement, defendants point out that a couple peers (Bilella and Moroney) only redeemed time outside the relevant time frame. That data did not figure in the analysis, as the analysis ignored any data from outside the relevant time period. In other words, they were identified as peers based on their certifications, but any time outside the relevant time period was ignored.

48. The Union's referral database indicates that there were a total of 18 referrals for "NGA Fusing" or "National Grid Fusing" certifications during the relevant time period, or approximately 0.000874381 of the referrals during the relevant time period.

49. The Union's referral records do not show a referral to the Skanska USA Civil Northeast ("SUCN") worksite in Astoria for a forklift operator in or around November 15, 2017. They do, however, show the referral of a White member on that date to that worksite to operate lights.

50. The Union's referral records show that on January 3, 2018, the Union referred another White member to operate a forklift at the SUCN work site in Astoria.

51. The Union's referral records show that on January 15, 2018, the Union referred a White member to the same job site to operate lights.

52. The Union's records show that during the period in question, Langford redeemed stamps representing a total of 216 hours of work from SUCN.

53. During the same period in question, the White engineered referred on November 15, 2017 redeemed stamps representing a total of 2,378 hours of work from SUCN.

54. During the same period in question, the White engineered referred on January 3, 2017 redeemed stamps representing a total of 1,273 hours of work from SUCN.

55. During the same period in question, the White engineered referred on January 15, 2018 redeemed stamps representing a total of 405 hours of work from SUCN.

56. The Union's records show that a member named Carlos Costa attended the hall at least four times and received at least one referral from the referral hall.

57. The out-of-order analysis showed that from 2013 through 2019, a job was assigned to a male member that plaintiff Sosa was qualified for on 114 occasions, even though Sosa was in the referral hall and had a lower reference number than the White member.

58. During the relevant time period, the average number of regular hours redeemed per employer per period by a male member was 293.

59. During the relevant time period, plaintiff Sosa redeemed an average of 54 regular hours per employer.

60. During the relevant time period, the average number of double time hours redeemed per employer per period by a male member was 49.

61. During the relevant time period, plaintiff Sosa redeemed an average of 15 double time hours per employer.

Dated: July 27, 2023

_____Shane Thompson_____
Shane Thompson, PhD

Exhibit A

| CERTIFICATION_ | CERTIFICATION_NAME | Group |
|---|---|---|
| 1 | BACKHOE | 1 |
| 2 | CHERRYPICKER | 4 |
| 3 | DOZER | 1 |
| 4 | LOADER | 1 |
| 5 | BOBCAT | 1 |
| 6 | ROLLER | 1 |
| 7 | GRADER | 1 |
| 8 | CDL | 1 |
| 9 | DRILLER | 1 |
| 10 | OILER/SERVICE MECHANIC | 2 |
| 11 | TRUCK CRANE | 0 |
| 12 | MAINTENANCE | 2 |
| 13 | MECHANIC | 2 |
| 14 | WELDER | 2 |
| 15 | MINI MAX | 1 |
| 16 | HAZMAT CERT | 0 |
| 17 | ASBESTOS STATE | 0 |
| 18 | FUEL HANDLER | 3 |
| 19 | LPG CERT | 3 |
| 20 | OXY ACET CERT | 3 |
| 21 | FORKLIFT | 1 |
| 22 | OTHER | 0 |
| 23 | PUMP | 0 |
| 24 | GENERATOR | 0 |
| 25 | LIGHTS | 0 |
| 26 | Rubber Tire Excavator | 1 |
| 27 | Fine Grade Dozer | 1 |
| 28 | UTILITY BACKHOE | 1 |
| 29 | WELDER-CITY CERT | 3 |
| 30 | WELDER-STATE CERT | 3 |
| 31 | WELDER-ConEd CERT | 3 |
| 32 | TOWER CRANE | 4 |
| 33 | SWEEPER | 1 |
| 34 | DEMO BOBCAT | 1 |
| 35 | OSHA 10 HOUR CERTIFICATION | 0 |
| 36 | CITY MTA | 0 |
| 37 | SWAC | 0 |
| 38 | AMTRACK | 0 |
| 39 | LIRR | 0 |
| 40 | TWIC | 0 |
| 41 | METRO NORTH | 0 |
| 42 | FIREWATCH | 0 |
| 43 | BOAT CAPT. | 5 |
| 44 | NATIONAL GRID FUSING | 5 |

| # | Item | Value |
|---|------|-------|
| 45 | CON EDISON FUSING | 5 |
| 46 | SCAFFOLD | 0 |
| 47 | A-LICENSE | 4 |
| 48 | VAC TRUCK | 1 |
| 49 | TRACK LOADER | 1 |
| 50 | STATEN ISLAND RAILWAY | 0 |
| 51 | FLUX CORE WELDING | 5 |
| 52 | NGA FUSING | 5 |
| 53 | FOREMAN | 6 |
| 54 | LGA- SAFETY TRAINING | 0 |
| 55 | 16 Hours Rigging | 0 |
| 56 | 32 Hours Rigging | 0 |
| 57 | Aerial Fueling | 4 |
| 58 | Signal Person | 0 |
| 59 | 7071 | 0 |
| 60 | ASBESTOS CITY | 0 |
| 61 | Service Engineer | 2 |
| 62 | MANITOU | 2 |
| 63 | OSHA 30 HOUR CERTIFICATION | 0 |
| 64 | 811 CARD | 0 |